110 T.C. No. 25


UNITED STATES TAX COURT


UNION TEXAS INTERNATIONAL CORPORATION, f.k.a.
UNION TEXAS PETROLEUM CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


UNION TEXAS PETROLEUM ENERGY CORPORATION
SUCCESSOR BY MERGER TO UNION TEXAS PETROLEUM CORPORATION,
f.k.a. UNION TEXAS PROPERTIES CORPORATION, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 15182-94, 15183-94.          Filed May 21, 1998.


R and P's predecessor, NP, executed a
series of three Forms 872 for 1985. R did
not know at the time of signing the Forms 872
that NP had merged with P and that NP no
longer had authority to extend the period of
limitations after Dec. 31, 1991.

Effective Dec. 31, 1982, P's
predecessor, OP, entered into an agency
agreement with PR, a sister company, to
process and sell propane for OP and NP to
unrelated third parties. OP and NP retained
title to its propane until PR sold it to
unrelated third parties. PR also sold its
own propane to T, a related retailer.

Ps assert that they should be permitted to use differing allocations for computing the Windfall Profit Tax (WPT) and Percentage Depletion Net Income Limitation (NIL).

1. <u>Held</u>:  P, Energy, is estopped to deny the validity of the Forms 872.  Knowledge of the merger is not attributed to R's WPT agents; computerized information of the merger was not accessible to them.

2. <u>Held</u>: Ps are independent producers, because they did not sell their propane to T.

3. <u>Held</u>: Sec. 4988(b)(3)(A), I.R.C., requires Ps to compute the NIL in the same manner under sec. 4988(b)(3)(A), I.R.C. and sec. 613, I.R.C.

<u>Jasper George Taylor III</u>, <u>Charles Washington Hall</u>, <u>William H. Caudill</u>, and <u>John B. Kinchen</u>, for petitioners.

<u>Sheri Wilcox</u>, for respondent.

OPINION

PARR, <u>Judge</u>:  In these consolidated cases, respondent determined the following deficiencies in windfall profit tax (WPT) for the taxable periods of 1983, 1984, and 1985, respectively: $3,471,045, $3,060,042, and $2,109,854.  Respondent determined the deficiencies against Union Texas Petroleum International (International) for 1983 and 1984, and against Union Texas Petroleum Energy (Energy) for 1985.  In their petitions, petitioners raised an issue pursuant to section

6512(b)[1], claiming overpayments of WPT for the taxable periods of 1983, 1984, and 1985, respectively, in the following amounts: $6,107,901, $5,969,611, and $7,931,434, resulting from a recomputation of the WPT net income limitation (NIL), or WPT NIL.

After concessions by the parties[2], the issues for decision are: (1) Whether petitioner, Energy, should be equitably estopped to deny that the limitations period for the taxable periods of 1985 were extended properly under section 6501(c)(4). We hold it should. (2) Whether, pursuant to section 613A(d)(2), Union Texas Petroleum Corporation (Old Petroleum) and Union Texas Petroleum Corporation (New Petroleum), f.k.a. Union Texas Properties Corporation (Properties) were independent producers during the taxable years in issue. We hold they were. (3) Whether petitioners are entitled to recompute Old Petroleum's and New Petroleum's WPT NIL computations for the taxable periods of 1983, 1984, and 1985, where the recomputations do not follow

---

[1]    All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

[2]    Subject to the issues discussed herein, including the overpayment issue, petitioners conceded the remaining issues raised in the notices of deficiency and petitions. Respondent conceded that petitioners are entitled to exclude from gross income a ratable portion of the lease bonus payments made with respect to producing properties for purposes of computing the WPT NIL and that petitioners are entitled to capitalize lease bonus payments in determining "as if" cost depletion.

the percentage depletion calculations claimed on their original Federal income tax returns. We hold they are not.[3]

Some of the facts have been stipulated and are so found. The stipulated facts and the accompanying exhibits are incorporated into our findings by this reference. At the time the petitions in these cases were filed, petitioners' principal place of business was located in Houston, Texas. For convenience, we present a general background section and combine our findings of fact with our opinion under each separate issue.

General Background

Corporate Structure--1982 Reorganization

Until December 31, 1982, Old Petroleum (Employer Identification Number, hereinafter EIN 74-6044301), a Delaware corporation, was a subsidiary of Allied Corporation (Allied), a New York corporation. Old Petroleum owned and operated 10 natural gas processing plants and held nonoperating interests in additional gas processing plants. During that time, Old Petroleum owned 100 percent of the stock of Texgas Corporation (Texgas), a Delaware corporation, which was in the business of retailing propane.

In a December 31, 1982, reorganization, Allied formed a new corporation called Union Texas Petroleum Holdings, Inc. (Holdings) (EIN 76-0040040) to serve as the parent of Old

---

[3] We have considered each of the remaining arguments of the parties and, to the extent that they are not discussed herein, find them to be unconvincing.

Petroleum and a new corporation called Union Texas Products Corporation (Products), a Delaware corporation.[4]  Pursuant to the reorganization, Old Petroleum contributed all of the assets of its hydrocarbons division to Products, including its natural gas gathering lines, gas processing plants, storage facilities, contracts for the sale of petroleum products, and all of the stock of Texgas.  In exchange, Old Petroleum received the stock of Products, which it then distributed to Holdings.  Thereafter, Products was a direct subsidiary of Holdings, Texgas was a direct subsidiary of Products, and Old Petroleum did not own stock in Products or Texgas.

Corporate Structure--1984 Reorganization

In a December 31, 1984, reorganization, Old Petroleum transferred all of its domestic oil and gas properties to New Petroleum (EIN 76-0125286), a Delaware corporation and subsidiary of Holdings, then known as Properties.  On March 5, 1985, New Petroleum changed its name from Union Texas Properties Corporation to Union Texas Petroleum Corporation.  Old Petroleum, presently known as International, currently exists as a Delaware corporation and is the petitioner in the instant case with respect to 1983 and 1984.

Corporate Structure--1991 Reorganization

On October 15, 1991, Holdings became the parent of a new corporation called Union Texas Petroleum Energy Corporation, or

---

[4]    Effective July 2, 1985, Allied sold one-half of the stock of Holdings.

Energy (EIN 76-0351014), a Delaware corporation.  Effective
December 31, 1991, pursuant to Delaware Corporation Law, New
Petroleum merged into Energy and ceased to exist.  Energy was the
surviving corporation under Delaware law and is the petitioner in
the instant case with respect to 1985.[5]

Issue 1. Equitable Estoppel for the Taxable Periods of 1985

1985 Forms 872--Consent To Extend the Time To Assess Tax

In the 1984 reorganization, Old Petroleum transferred its
domestic oil and gas properties to New Petroleum, then known as
Properties.  Thus, the responsibility for filing WPT returns
shifted from Old Petroleum to Properties.  On March 5, 1985,
Properties changed its name to New Petroleum.  Despite the name
change, New Petroleum continued to file its Forms 720, Quarterly
Federal Excise Tax Returns (Forms 720), for the first three
taxable quarters of 1985 under the name of Properties.

To keep the period of limitations open while respondent
continued to conduct the WPT examination of New Petroleum for the
1985 taxable periods, respondent and New Petroleum began
executing a series of Forms 872, the last of which was meant to
extend the limitations period to June 30, 1994.  At that time,
what respondent's WPT revenue agents (WPT agents or agents) did

---

[5]    When this opinion addresses the actions of the actual
parties to this litigation, the term "petitioners" refers to
Energy and International.
    When references in this opinion apply to all of the
affiliated Union Texas Petroleum corporate entities, either the
term Union Texas companies or affiliated corporations is used.

not know was that there had been another reorganization in which New Petroleum merged with Energy, and as of December 31, 1991, ceased to exist.  As a result of the merger, New Petroleum no longer had authority to extend the period of limitations after December 31, 1991.  Yet, New Petroleum, through its former officers, Sanford M. Lobliner (Lobliner), and M.N. Markowitz (Markowitz),[6] executed the following three Forms 872 after it had merged out of existence:

| Extended Date | Date New Petroleum Signed | Date Respondent Signed |
| --- | --- | --- |
| 6/30/93 | 7/22/92 | 8/24/92 |
| 12/31/93 | 1/14/93 | 2/11/93 |
| 6/30/94 | 7/27/93 | 7/30/93 |

Each of these three consents was prepared by respondent's Appeals Office in Houston, Texas.  Each consent identified the taxpayer as "Union Texas Petroleum Corporation (formerly Union Texas Properties Corporation) (Successor to Union Texas Petroleum Corporation 74-6044301)" and listed the EIN as 76-0125286.  The consents should have identified the taxpayer for 1983 and 1984 as Union Texas International Corporation, F.K.A. Union Texas Petroleum Corporation, and for 1985 as Union Texas Petroleum Energy Corporation, successor by merger to Union Texas Petroleum Corporation, F.K.A. Union Texas Properties Corporation.  When New Petroleum returned the consents to respondent, the Form 872 extending the assessment date to June 30, 1993, bore Lobliner's signature, and the two Forms 872 extending the assessment dates

---

[6]    In 1992 and 1993, respectively, Lobliner and Markowitz were the vice presidents of Energy and would have had authority to have properly prepared a Form 872 on petitioners' behalf.

to December 31, 1993, and June 30, 1994, respectively, bore Markowitz's signature, both of whom signed as vice presidents of New Petroleum.

On March 9, 1992, respondent sent New Petroleum the revenue agent's report for the taxable periods of 1985, addressed to Union Texas Petroleum Corporation, F.K.A. Union Texas Properties Corporation, as was the consent. On April 24, 1992, in response to the revenue agent's report, Lobliner submitted to respondent a protest of respondent's determinations for 1985. The protest was on a preprinted letterhead styled Union Texas Petroleum. The case remained under consideration by respondent's Appeals Office until May 26, 1994, when the notice of deficiency for 1985 was issued.[7]

At no time before the petitions in these cases were filed did anyone representing New Petroleum or Energy directly inform the agents conducting the WPT examination or the Appeals officers considering the cases that New Petroleum was defunct and had no authority to act, that Lobliner and Markowitz were not officers of New Petroleum and did not have authority to execute the Forms 872 for the 1985 taxable periods, that future correspondence

---

[7] On May 26, 1994, respondent mailed two notices of deficiency to petitioners' Houston address. The notice of deficiency for 1983 and 1984 was in the name of Old Petroleum with EIN 74-6044301. Those years are not affected by the equitable estoppel issue. The notice of deficiency for 1985 was in the name of New Petroleum with EIN 76-0125286. This is the deficiency notice subject to the equitable estoppel issue.

should be directed to Energy, or that future Forms 872 should be executed by Energy.

Discussion

Respondent contends that Energy should be estopped to deny the validity of the last three Forms 872 signed by Lobliner and Markowitz on behalf of New Petroleum, because Energy, through its officers, agents or employees, intentionally deceived respondent by failing to disclose New Petroleum's merger into Energy, thereby causing respondent to withhold assessment in reliance upon the consents.  Energy asserts that it did not make any false representations to, or maintain any misleading silences in connection with, New Petroleum's merger into Energy. Furthermore, Energy claims that when the last three Forms 872 were signed respondent not only knew of New Petroleum's merger, but had a convenient means of acquiring such knowledge.  Finally, Energy contends that in preparing and executing the last three Forms 872, respondent did not rely on any acts or statements made by Energy's representatives, because respondent's agents prepared the Forms 872 by looking only at prior Forms 872 and New Petroleum's Federal income tax return for the year in issue.

Pursuant to section 6501(c)(4) a taxpayer and the Secretary or his delegate, before the expiration of the period provided by statute for assessment and collection of income tax, may consent in writing to an extension of that period, and further extensions may be made by subsequent written agreements entered into before the expiration of the period previously agreed upon.

Respondent concedes that because the Forms 872 were signed by Lobliner and Markowitz on behalf of New Petroleum after it had merged out of existence, and not on behalf of Energy, they were invalid. Thus, respondent further concedes that since the notice of deficiency for Energy's 1985 taxable periods was mailed more than 3 years after Energy filed its Federal income tax return for that year, assessment and collection of a deficiency for 1985 are barred, unless we hold that the last three Forms 872 signed by Lobliner and Markowitz are valid extensions of the statute of limitations. Sec. 6501(a).

Generally speaking, equitable estoppel precludes a party from denying that party's own acts or representations which induced another to act to the other's detriment. Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. per curiam 673 F.2d 784 (5th Cir. 1982). The doctrine of equitable estoppel is based on the grounds of public policy, fair dealing, good faith, and justice, and is designed to aid the law in the administration of justice where without its aid injustice might result. Id. The elements of equitable estoppel have been variously described, but for our purposes they may be stated as follows: (1) There must be a false representation or wrongful misleading silence by the party against whom the estoppel is claimed; (2) the error must originate in a statement of fact, not in opinion or a statement of law; (3) the party claiming the benefits of the estoppel must have actually and reasonably relied on the acts or statement of

the party against whom the estoppel is claimed, and as a consequence of that reliance must be adversely affected by the acts or statements of the one against whom an estoppel is claimed; and (4) the party claiming the benefits of estoppel must not know the true facts. Century Data Sys., Inc. v. Commissioner, 86 T.C. 157, 165 (1986); Graff v. Commissioner, supra at 761; Steiner v. Commissioner, T.C. Memo. 1995-122. The party affirmatively asserting an estoppel has the burden of proving all the essential elements constituting the estoppel. Steiner v. Commissioner, supra. Accordingly, respondent bears the burden of proving each of the above elements. Rules 39, 142(a).

1. Misrepresentation or Misleading Silence

To sustain equitable estoppel, respondent must show that Energy took "some action" which misled respondent. Century Data Sys. Inc. v. Commissioner, supra at 166. Respondent contends that Energy made false representations or wrongful misleading silences, when it did not tell respondent that New Petroleum had merged out of existence, and that its officers had no power to act. Respondent further contends that the representations were part of a pattern of false representations and misleading silences that caused respondent to believe mistakenly that the period of limitations had been extended. Respondent argues that these material misrepresentations were bolstered by Energy's continuing relations with respondent's Appeals officers, where

items of correspondence were sent and received during the audit process in the name of Union Texas Petroleum Corporation, without any mention of a change in corporate structure. Respondent further argues that Energy was aware of respondent's concern with the accuracy of the name and signature on the Forms 872. In fact, once respondent learned that Properties had changed its name to New Petroleum, respondent immediately sought new Forms 872, reflecting the new name. Moreover, respondent notes that during the examination of the taxable periods of 1983 and 1984, Union Texas Petroleum's Chief Executive Officer gave respondent a letter certifying Lobliner's authority to execute consents for those years. Respondent contends that Energy's failure to inform respondent that Lobliner, and subsequently Markowitz, no longer had authority to act on behalf of New Petroleum was clearly disingenuous.

We agree with respondent. We are not persuaded by petitioner's attempt to obfuscate this issue with the testimony of Joseph Wayne Cliett (Cliett), who was the supervisor of tax audits for Old Petroleum, New Petroleum, Energy, and the other affiliated corporations at the time of trial and during the taxable years in issue. Cliett, as tax supervisor of the Union Texas companies, knew of the tax returns being filed by each of the different Union Texas companies. Moreover, he was responsible for obtaining the appropriate signatures on the Forms 872. Cliett testified that upon receiving the first of the last

three Forms 872 from the Internal Revenue Service (IRS) which extended the assessment date to June 30, 1993, Cliett presented it for signature to Lobliner, his supervisor during 1992. Upon receiving the last two Forms 872 which extended the assessment date to December 31, 1993, and June 30, 1994, respectively, Cliett presented them for signature to Markowitz, who became his supervisor sometime in 1993. Cliett alleges, however, that when he presented the last three Forms 872 for signature to Lobliner and Markowitz he did not know that New Petroleum had dissolved. Cliett claims that he was not aware of the merger, because his payroll checks failed to identify the specific entity for which he worked, and he did not pay "much attention" to the Forms W-2 that he received.

We find Cliett's testimony to be implausible given his extensive tax and accounting background, coupled with his vast knowledge of petitioners' business organization and operations. Cliett testified that he has worked nearly 30 years for petitioners or one of their affiliated corporations, that he is the supervisor for tax audits, and he is familiar with the business organization and operations of the Union Texas companies. At trial, Cliett was easily able to identify each Union Texas company, to delineate the various departments within each corporation, and to describe the primary functions of each division within the various corporate departments. Thus, it is most difficult to believe that at the time the last three Forms

872 were signed, Cliett did not know of New Petroleum's dissolution or did not know that Lobliner and Markowitz no longer had authority to sign the Forms 872 on behalf of the defunct corporation.

Assuming arguendo, that Energy knew of the error contained in the last three Forms 872 (which it does not concede), Energy, in reliance on Century Data Sys., Inc. v. Commissioner, supra at 170, asserts that it was under no affirmative duty to bring respondent's mistakes to respondent's attention. We disagree and find Energy's reliance on Century Data Sys., Inc. v. Commissioner to be misplaced. Energy fails to mention this Court's qualification of that proposition; namely, that there is no obligation to correct respondent's mistakes provided the "petitioner did nothing to encourage the faulty assumption." Id. at 171. Here, Energy's entire course of conduct encouraged respondent's faulty belief that New Petroleum existed at the time the last three Forms 872 were signed. When Lobliner and Markowitz signed the last three consents Energy knew that New Petroleum did not exist, and that Lobliner and Markowitz were not officers of that corporation. Energy not only failed to call this error to respondent's attention, but intentionally fostered it by continuing to communicate to the IRS through correspondence that bore the name and EIN of the dissolved corporation. Thus, based on the record and the facts discussed herein, we find that

respondent has met his burden of proving that these actions satisfy the first element of equitable estoppel.

2. Fact or Law

For equitable estoppel to apply, the misrepresentation or wrongful misleading silence generally must originate in a statement of fact and not in an opinion or a statement of law. Graff v. Commissioner, 74 T.C. at 761.

While it could be argued that the effect of New Petroleum's merger into Energy is a legal question, the misrepresentations or silence relate to the facts herein; namely, that at the time the last three Forms 872 were signed New Petroleum existed, and that the individuals signing the consents were its properly authorized officers.  Given that Energy's misrepresentations or wrongful misleading silences clearly originate in a statement of fact, we find respondent has met his burden with respect to the second element of equitable estoppel.

3. Detrimental Reliance

"It is fundamental to the doctrine of estoppel that the party raising the issue must have been misled in reliance upon the representations of his opponent." Century Data Sys., Inc. v. Commissioner, 86 T.C. at 166; see also Atlas Oil & Ref. Corp. v. Commissioner, 22 T.C. 552, 559 (1954) (taxpayer must be shown to have taken some action which led Commissioner to postpone until after the period of limitations expired the issuance of a notice of deficiency that he was otherwise prepared to mail on a timely basis).

Here, Energy's critical act was to sign the consents without informing respondent that the individuals signing them were not, as they represented themselves to be, officers of New Petroleum. Had respondent known that Lobliner and Markowitz were not officers of New Petroleum and that the corporation did not exist, respondent could have obtained either a correct consent from Energy or issued a notice of deficiency before the period of limitations expired with respect to 1985. Accordingly, we find that respondent reasonably relied to his detriment on petitioner's misrepresentations or silences with respect to the merger transaction.

4. Knowledge of the Facts

To meet the fourth prong of equitable estoppel, the Government must prove not only that respondent was "'destitute of knowledge of the real facts as to the matter in controversy, but should also have been without convenient or ready means of acquiring such knowledge.'" Southwestern Inv. Co. v. Commissioner, 19 B.T.A. 30, 47 (1930) (citing Brant v. Virginia Coal and Iron Company, et. al, 93 U.S. 326, 337 (1876)).

Respondent contends that neither the agents nor Appeals officers involved with the WPT audit had actual knowledge of New Petroleum's dissolution at the time the last three Forms 872 were signed. Moreover, respondent points to the fact that petitioners stipulated that both Energy and New Petroleum failed to inform the WPT agents of the true situation regarding the merger.

Energy asserts that even if the WPT agents did not have actual knowledge of the merger (a fact which it does not concede), numerous documents submitted to respondent's service center constituted sufficient notice to respondent that New Petroleum had ceased to exist at the time New Petroleum signed the last three Forms 872, on July 22, 1992, January 14, 1993, and July 27, 1993, respectively. It is stipulated that no later than May 11, 1992, more than 3 months before the first Form 872 was signed, the Austin Service Center received New Petroleum's final quarterly employment tax return (Form 941) marked "cancel corporation merged out of existence." Energy further points out that respondent stipulated that no later than September 8, 1992, respondent's Austin Service Center received copies of a statement of merger as required under section 1.368-3, Income Tax Regs., and a certificate of merger of New Petroleum into Energy, respectively, that were attached to the 1991 consolidated Federal income tax return (Form 1120), filed by Holdings, New Petroleum's parent company. Finally, in reliance on Badger Materials, Inc. v. Commissioner, 40 T.C. 725, 733, withdrawn and modified in part by Badger Materials, Inc. v. Commissioner, 40 T.C. 1061 (1963) (not affecting this issue), Energy contends that as of December 17, 1991, when the certificate of merger was filed with the Delaware secretary of state indicating that as of December 31, 1991, New Petroleum would cease to exist, such information became a matter of public record and readily available to respondent. Accordingly, petitioner contends that respondent not only had

actual knowledge of the merger, but also had the means by which respondent's WPT agents could have readily acquired such knowledge. Southwestern Inv. Co. v. Commissioner, supra.

In Paramount Warrior, Inc. v. Commissioner, T.C. Memo. 1976-400, affd. without published opinion 608 F.2d 522 (5th Cir. 1979), a case which is in many respects similar to the instant case, we declined to decide whether the notification of a merger in correspondence with one of respondent's service centers, or in a parent company's consolidated return, constituted sufficient knowledge on the part of respondent, because we found as a fact that the field agents involved with the examination had actual knowledge that the corporation, on whose behalf the Forms 872 were signed, had merged out of existence. Id. In the instant case, we are faced with precisely the question deferred in Paramount Warrior.

Energy asserts that the two groups of documents filed with respondent's Austin Service Center should be considered notice of New Petroleum's dissolution, and therefore such knowledge should be attributable to the WPT agents who conducted the examination and who drafted the last three Forms 872. The first group of documents on which Energy relies consists of the 1991 consolidated Form 1120 filed by Holdings along with the merger documents attached thereto. The second group of documents consists of the 1991 employment tax returns (Forms 940 and 941) filed in New Petroleum's name. Energy argues that the WPT agents

should be charged with knowledge of the information contained in these documents.

Respondent contends that the revenue agents and Appeals officers involved in the WPT cases could not have been expected to learn of New Petroleum's merger from the information submitted to the Austin Service Center in Holding's 1991 Form 1120. For income tax purposes, New Petroleum was a member of a consolidated group headed by Holdings. Accordingly, the statement of merger and certificate of merger which New Petroleum filed were attached to Holdings' Form 1120 as pages 573 and 574, respectively, of a 632-page consolidated Federal income tax return. The income tax return was filed under the name and EIN of Holdings, which was different from Energy's EIN. Moreover, neither page 573 nor page 574 contained Energy's EIN. Thus, respondent contends that the computer transcripts requested by the WPT agents using New Petroleum's EIN did not reflect the changes in its corporate status shown on Holdings' Form 1120.

We agree with respondent. It is stipulated that the Austin Service Center received Holdings' Form 1120 on September 8, 1992, after the first of the three Forms 872 was signed. However, an inspection of the actual Form 1120 reveals that the return was not surveyed by the income tax examination group until January 14, 1995, nearly 18 months after the last consent in issue was signed. Thus, based on the facts discussed herein, we shall not attribute knowledge of New Petroleum's merger, which may have been acquired by revenue agents conducting an unrelated income

tax audit of petitioners for the taxable years in issue, nearly 18 months after the last consent was signed, to the agents or Appeals officers conducting the WPT examination. Cf. King v. Commissioner, 857 F.2d 676, 680 (9th Cir. 1988) (adopting general theory that knowledge acquired by the IRS in unrelated investigations is not necessarily imputed from one division to another and citing United States v. Zolla, 724 F.2d 808, 810-811 (9th Cir. 1984)), affg. 88 T.C. 1042 (1987). Furthermore, we find that New Petroleum did not provide respondent with notice of the merger by filing Forms 940 and 941 in 1991 (employment tax filings), because, as in the income tax situation, those filings address a different tax, a different form, and are subject to review by a different IRS division. Id.

With respect to the information available to the WPT agents in the IRS' computer system, the record establishes that although a computer updating procedure existed for income tax return audits which would have reflected a change in New Petroleum's corporate status, there was no such system in place for audits of WPT or employment tax returns. At trial, Revenue Agent Bruce Rhames (Agent Rhames), the group manager assigned to conduct the WPT examination for 1985, credibly testified that where, as in the instant cases, the income tax returns were not under his control and something changed which did not pertain exactly to his taxpayer, such as a change in the taxpayer's name, its EIN, or the amount of tax paid, he was not notified of the change. Rhames explained that New Petroleum's merger into Energy

was not reflected in the computer transcripts generated using New Petroleum's EIN, which were used to confirm that the information on the last three Forms 872 was correct.

Respondent's argument rests on the premise that any knowledge of New Petroleum's merger obtained by personnel at the Austin Service Center should not be attributed to the WPT agents, because respondent did not have a computer system in place at the time the last three Forms 872 were drafted, which would have enabled the agents to access this information easily.  We agree with respondent.  See also Southwestern Inv. Co. v. Commissioner, 19 B.T.A. 30 (1930) (citing Brant v. Virginia Coal & Iron Co., 93 U.S. 326, 337 (1876); cf. Abeles v. Commissioner, 91 T.C. 1019 (1988).

In Abeles v. Commissioner, supra at 1035, our decision turned on the then-existing availability of computer-generated information using the taxpayer's Social Security number.  There, we held that for purposes of determining whether a notice of deficiency has been properly mailed to the taxpayer's last known address, an agent issuing a deficiency notice generally is charged with knowledge of a taxpayer's last known address which appears on the taxpayer's most recently filed tax return.  In Abeles, we found as a fact that the then-existing computer capabilities of the IRS were such that an agent responsible for issuing a notice of deficiency had the ability to conduct, within a few moments, a search of the IRS computer files for a more recent address for the taxpayer. Id. at 1033-1035.  In so

holding, we noted that "the state of the IRS' computer capabilities is such that a computer search of the information retained with respect to a certain taxpayer, including their last known address, may be performed by respondent's agent without unreasonable effort or delay." Id. at 1033.

Here, the IRS' computer system did not provide the ability to conduct within a reasonable time a cross-check of the taxpayer's income tax, WPT, and employment tax returns that would have revealed the taxpayer's change in corporate status, using a single EIN. Thus, Abeles v. Commissioner, supra, while analogous, is clearly distinguishable from the case at hand.

Finally, we address Energy's argument that respondent easily could have determined that New Petroleum had merged out of existence by checking with the Delaware secretary of state, which as of December 17, 1991, had the certificate of merger on file. In making this argument, Energy relies on Badger Materials, Inc. v. Commissioner, 40 T.C. 725, 733 (1963), withdrawn and modified in part by Badger Materials, Inc. v. Commissioner, 40 T.C. 1061 (1963) for the proposition that filing of merger documents with the secretary of state constitutes notice of merger to the IRS. We disagree and find Energy's reliance on Badger Materials, Inc. to be misplaced. In Badger Materials, Inc., the taxpayer corporation was dissolved and generally ceased to exist. Following the dissolution, the treasurer of the defunct corporation executed consents purporting to extend the period for assessment of Federal income tax. Within the period of

limitations as purportedly extended, the IRS issued a notice of deficiency to the corporation and a notice of transferee liability to the transferee of the corporation's assets. The corporation and the transferee denied the validity of the consents on the ground that they were executed after the corporation had been dissolved. The IRS argued that the corporation and transferee were equitably estopped from denying the validity of the consent forms. We disagreed and held for the taxpayers.

However, the facts in Badger Materials, are distinguishable from the facts herein. In Badger Materials, we found as fact that there was no lack of knowledge of the corporation's dissolution on the part of the IRS. Energy argues that Badger Materials stands for the proposition that the Government had knowledge of the corporation's merger at the time the consent forms were signed, because the corporation had filed articles of dissolution with the secretary of state of Wisconsin, thus making the matter "public record". However, the filing of dissolution documents was merely one fact that this Court relied on in holding for the taxpayers. There, the taxpayer corporation also filed a final Federal income tax return with the IRS under its own name and listing its EIN. The return included a statement concerning the liquidation and a copy of the minutes of the stockholder's meeting adopting the plan of dissolution. Here, as previously discussed, the statement of merger and the certificate of merger filed by New Petroleum were attached as pages 573 and

574 of a 632-page consolidated Federal income tax return filed by Holdings, New Petroleum's parent corporation. Moreover, in Badger Materials, we attributed the merger information contained in the taxpayer's Federal income tax return to the agent conducting the income tax audit, not to an agent responsible for an unrelated audit of a different kind of tax.

Finally, although neither party addresses this point, we note that the returns under audit herein for the taxable periods of 1985 were New Petroleum's Quarterly Federal Excise Tax Returns (Form 720). On Form 720, there is a line which states that if the taxpayer will not be liable for returns in succeeding quarters, then the word "FINAL" should be entered. Had New Petroleum entered the word "FINAL" on the appropriate line, that might have been sufficient to put respondent on notice of New Petroleum's merger into Energy. However, Energy's failure to introduce into evidence New Petroleum's final 1991 Form 720 leads us to infer that no such entry appears on the form. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

Thus, based on the record and the facts discussed herein, we hold that Energy is equitably estopped to deny that the limitations period for the taxable periods of 1985 was extended properly under section 6501(c)(4).[8]

---

[8] Even if we were to find that the error in the extension was the result of mutual mistake, rather than any deliberate deception on petitioner's part, the Court has the power to reform
(continued...)

Issue 2.  Independent Producer Issue[9]

Background

Pursuant to the 1982 reorganization, Old Petroleum contributed all of the assets of its hydrocarbons division to Products, including all of the stock of Texgas.  In exchange, Old Petroleum received the stock of Products, which it then distributed to Holdings, the parent company of Products and Old Petroleum.  Thereafter, Products owned 100 percent of the stock of Texgas, a retailer of propane,[10] and Old Petroleum no longer owned stock in Products or Texgas.  In the December 31, 1984, reorganization, Old Petroleum transferred all of its domestic oil and gas properties to New Petroleum, which was also a subsidiary of Holdings.  Petroleum, Products, and Texgas were related persons within the meaning of section 613A(d)(3).

Petroleum was in the oil and gas exploration and production business.  Products was in the business of processing and marketing oil and natural gas and their derivatives, including propane, for Petroleum as well as for unrelated oil and gas producers.

---

[8](...continued)
the written instrument to conform to the agreement and intent of the parties.  See Woods v. Commissioner, 92 T.C. 776, 789 (1989).

[9]    When references in this opinion apply to both Old Petroleum and New Petroleum, the term "Petroleum" is used.

[10]    Propane is a product derived from natural gas under sec. 1.613A-7(r)(3), Income Tax Regs.  Accordingly, references herein to natural gas include propane.

Effective December 31, 1982, Old Petroleum and Products entered into a service agreement under which Products agreed, for a cash fee, to act as an agent for Petroleum to process and sell its propane to unrelated third parties. As Petroleum's agent, Products handled Petroleum's marketing, distribution, storage, sales, and collection efforts. Pursuant to the service agreement, Petroleum retained title to its propane until Products sold the propane on Petroleum's behalf to unrelated third parties. Neither Products nor Texgas was a buyer or seller under Petroleum's sales contracts with unrelated third parties.

Petroleum produced natural gas from individual wells, which went to 10 different processing plants. From 3 of the 10 processing plants, Petroleum moved its propane by pipeline to a storage terminal at Mont Belvieu, Texas. By exchange agreements, Petroleum exchanged the volumes of propane at the 7 other plants for a like volume of propane held by Products. Petroleum's use of the exchange agreements as a substitute for physical transportation was both economically efficient and a common practice in the oil and gas industry. Moreover, the propane owned by Petroleum and Products satisfied strict industry standards so that the propane volumes could be easily commingled and exchanged.

As Products sold Petroleum's propane, the accounting group recorded those sales as Petroleum's sales in accordance with Petroleum's accounting practices, which were customary in the oil and gas business and were consistently applied. Petroleum's

general ledger showed the sale of Petroleum's propane inventory by Petroleum, with Products as agent, to unrelated third parties in bulk sales. Petroleum's handling of its propane inventory was consistent with industry practice.

As agent for Petroleum, Products collected from third party purchasers payments due to Petroleum, and it was responsible for pursuing any unpaid propane bills. If, however, a bill remained unpaid, it was Petroleum, not Products, that had to bear the loss. For the taxable years in issue, Petroleum, Products, and Texgas had the following volumes and values of propane production:

| Parties | Propane Sales Volume (gallons) | Propane Sales Value |
|---|---|---|
| 1983 | | |
| Old Petroleum | 8,521,279 | $3,918,477 |
| Products | 290,982,398 | 142,699,588 |
| Texgas | 152,234,737 | 131,469,955 |
| | | |
| 1984 | | |
| Old Petroleum | 5,349,081 | [1]$2,307,907 |
| Products | 351,855,506 | 161,166,870 |
| Texgas | 159,090,931 | 136,352,438 |
| | | |
| 1985 | | |
| New Petroleum | 7,930,188 | $2,994,311 |
| Products | 289,494,801 | 116,275,633 |
| Texgas | 151,400,579 | 124,263,589 |

[1] Petitioners concede that due to an accounting error, the $2,307,907 amount shown as Old Petroleum's propane sales for 1984, although reflected in Petroleum's books, does not include gross receipts received by Old Petroleum from its sales of 818,708 gallons of propane in December 1984. The highest price per gallon of propane during 1984 was approximately 58 cents. Thus, Old Petroleum's gross receipts from its December 1984 propane sales would have been no more that approximately $475,000, resulting in annual gross receipts of no more than $2,782,907 for that year.

For 1983, 1984, and 1985, respectively, Products sold 155,614,505, 156,887,148, and 155,225,544 gallons of propane to Texgas. Given that Products was able to obtain all the propane

it needed from sources other than Petroleum, Petroleum's production was not necessary for Products to meet its supply obligations to Texgas.

Discussion

Respondent determined for the taxable years in issue that pursuant to section 613A(d)(2)(A)[11] and section 1.613A-7(r)(2),

---

[11]  Section 613A provides, in pertinent part, as follows:

SEC. 613A(d)(2). Retailers Excluded.--Subsection (c) shall not apply in the case of any taxpayer who directly, or through a related person, sells oil or natural gas (excluding bulk sales of such items to commercial or industrial users), or any product derived from oil or natural gas (excluding bulk sales of aviation fuels to the Department of Defense)--

    (A) through any retail outlet operated by the taxpayer or a related person, or

    (B) to any person--

        (i) obligated under an agreement or contract with the taxpayer or a related person to use a trademark, trade name, or service mark or name owned by such taxpayer or related persons, in marketing or distributing oil or natural gas or any product derived from oil or natural gas, or

        (ii) given authority, pursuant to an agreement or contract with the taxpayer or a related person to occupy any retail outlet owned, leased, or in any way controlled by the taxpayer or a related person.

Notwithstanding the preceding sentence this paragraph shall not apply in any case where the combined gross receipts from the sale of such oil, natural gas, or any product derived
(continued...)

Income Tax Regs.[12], Petroleum was not an independent producer, because it sold propane through Texgas, a related retailer. Petitioners assert that Petroleum qualifies as an independent producer because it sold its propane in bulk to unrelated third parties and in no year did its own sales exceed $5 million.

Respondent's argument is premised on the presumption that the 1982 reorganization was a "scheme" developed by Petroleum's tax department to allow Petroleum to qualify as an independent producer for the taxable years in issue. To foster the illusion that Petroleum's propane was being sold to unrelated third parties, respondent argues, Old Petroleum entered into the service agreement and exchange agreements with Products to disguise the fact that Petroleum was selling propane through Texgas. Thus, respondent contends that Products did not act as Petroleum's agent, but that it acquired (took title to) Petroleum's propane and subsequently sold the propane to Texgas.

---

[11](...continued)
therefrom, for the taxable year of all retail outlets taken into account for purposes of this paragraph do not exceed $5,000,000. * * *

[12] Sec. 1.613A-7(r)(2), Income Tax Regs., provides in pertinent part:

(2) * * * A taxpayer shall be deemed to be selling oil or natural gas (or a derivative product) through a retail outlet operated by a related person in any case in which a related person who operates a retail outlet acquires for resale oil or natural gas (or a derivative product) which the taxpayer produced or caused to be made available for acquisition by the related person pursuant to an arrangement whereby some or all of the taxpayer's production is marketed. * * * [Emphasis added.]

Accordingly, respondent argues that Petroleum is denied independent producer status, because pursuant to section 613A(d)(2)(A) and section 1.613A-7(r)(2), Income Tax Regs., Petroleum is deemed to be selling its propane through a retail outlet (Texgas) operated by a related person (Products).

We disagree. A taxpayer is generally free to structure its business transactions as it pleases, though motivated by tax reduction considerations, provided the transaction is imbued with a sufficient business purpose. Gregory v. Helvering, 293 U.S. 465 (1935); Casebeer v. Commissioner, 909 F.2d 1360 (9th Cir. 1990), affg. in part, revg. in part and remanding T.C. Memo. 1987-628; Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 196 (1983), affd. on this issue, revd. in part 752 F.2d 89 (4th Cir. 1985). On brief respondent seems to be arguing that Petroleum devised the 1982 reorganization to obtain tax benefits associated with independent producer status. Respondent, however, does not argue that the reorganization was devoid of economic substance, nor does respondent challenge the validity of Petroleum's corporate structure. Rather, respondent asks us to disregard the provision of the service agreement which establishes that Petroleum was to retain title to its propane until Products sold the propane on Petroleum's behalf to unrelated third parties. We decline to do so.[13]

---

[13]    Respondent does not dispute that Petroleum qualifies as an independent producer if the terms of the service agreement are respected. See Rev. Rul. 92-72, 1992-2 C.B. 118.

On the basis of the entire record, we are convinced tt not merely in form, but in substance, Products acted as an agent for Petroleum and pursuant to the service agreement did not purchase any of the propane that it marketed for Petroleum. We note that Petroleum's production was not necessary for Products to meet its supply obligations to Texgas because Products was able to obtain all the propane it needed from sources other than Petroleum. Furthermore, it was Petroleum, not Products, that bore the risk of loss if any propane bills remained unpaid. Thus, as discussed supra, we find as a fact that Petroleum, under the service agreement, retained title to its propane until Products sold the propane on Petroleum's behalf. Accordingly, we hold that Products did not acquire Petroleum's propane for resale to Texgas, and that Petroleum, pursuant to section 613A(d)(2)(A) and section 1.613A-7(r)(2), Income Tax Regs., is not deemed to be selling its propane through Texgas, a retail outlet operated by Products, a related person. Therefore, Petroleum qualifies as an independent producer for the taxable years in issue.

Issue 3. Recomputation of Petroleum's WPT NIL Computations

Background

On its original Federal income tax returns for each of the taxable years in issue, Petroleum claimed percentage depletion as an independent producer. With certain statutory modifications, Petroleum's original percentage depletion NIL calculations paralleled its original WPT NIL calculations. When calculating

its original percentage depletion NIL, Petroleum generally included the same amounts as overhead (indirect expenses) and followed the same apportionment procedures as were included and followed in its original WPT NIL computations.

In the petitions filed in these cases, petitioners asserted for the first time that they should be permitted to modify their allocation process for computing the WPT NIL.[14] During May and September of 1995, petitioners provided respondent with a revised apportionment formula for computing the WPT NIL. To the amounts that were included in overhead in their original computations, petitioners contend that they should be permitted to include as additional overhead six new categories of indirect costs, which petitioners claim are attributable to the mining process. In their revised computations, petitioners also changed their method for allocating overhead among producing properties and between gas and oil on a single property from actual revenue to production, using a conversion ratio derived from relative market prices of gas and oil.

Discussion

Respondent determined the following deficiencies in WPT for the taxable periods of 1983, 1984, and 1985, respectively:

---

[14] Respondent did not raise this issue in the notices of deficiency.

$3,471,045, $3,060,042, and $2,109,854.[15]  On August 22, 1994, each petitioner timely filed a petition with this Court contesting the entire amount of the deficiencies asserted. In addition thereto, petitioners claimed overpayments of WPT of $6,107,901, $5,969,611, and $7,931,434 for the taxable periods of 1983, 1984, and 1985, respectively, resulting from a recomputation of their WPT NIL calculations.  At trial and on brief, respondent contends that Petroleum's WPT NIL recomputations are not in accord with section 1.613-5(a), Income Tax Regs., because they impermissibly deviated from the percentage depletion calculations claimed on Petroleum's original returns.[16]  Accordingly, respondent argues that petitioners

---

[15]    The deficiencies as determined by respondent are in windfall profit taxes for the taxable periods in issue and in the amounts set forth below:

| Taxable Period Ended | Amount |
| --- | --- |
| Mar.  31, 1983 | $898,508 |
| June  30, 1983 | 882,297 |
| Sept. 30, 1983 | 865,264 |
| Dec.  31, 1983 | 824,976 |
| Mar.  31, 1984 | 874,332 |
| June  30, 1984 | 594,829 |
| Sept. 30, 1984 | 649,637 |
| Dec.  31, 1984 | 941,244 |
| Mar.  31, 1985 | 554,711 |
| June  30, 1985 | 516,123 |
| Sept. 30, 1985 | 535,574 |
| Dec.  31, 1985 | 503,446 |
| Total | 8,640,941 |

[16]    Respondent further argued that petitioners' new WPT NIL calculations should be rejected, because they are not defensible under cost accounting principles.  We find it unnecessary to

(continued...)

should be proscribed from modifying the overhead allocation process used in their original WPT NIL calculations and instead be required to retain the method originally employed, which parallels their percentage depletion calculations and which was accepted by respondent during the examination process. Cf. sec. 1.613-4(d)(2), Income Tax Regs. (generally, if a taxpayer has consistently employed a reasonable method of determining the costs of the various phases of the mining and nonmining process, such method shall not be disturbed).

In response to phased decontrol of crude oil prices announced by President Carter in April 1979, and increased worldwide crude oil prices, Congress determined that the additional revenues of "windfall" that U.S. oil producers would thereby receive were an appropriate object of taxation. H. Rept. 96-304 at 7 (1979), 1980-3 C.B. 81, 91; S. Rept. 96-394 at 6 (1979), 1980-3 C.B. 131, 142. Consequently, Congress enacted the Crude Oil Windfall Profit Tax Act of 1980 (Windfall Profit Tax Act), Pub. L. 96-223, 94 Stat. 229, which from March 1, 1980, until its repeal effective August 23, 1988, imposed an excise on the "windfall profit" from certain crude oil produced in the

---

[16](...continued)
address this issue given that we hold, based on respondent's threshold argument, that petitioners cannot compute the NIL using one allocation method for percentage depletion purposes, which has the effect of increasing their deduction, and a different method for WPT purposes, which has the effect of reducing their WPT.

United States.  See sec. 4986(a).  Under the Windfall Profit Tax

Act, the applicable tax rate is applied to the windfall profit

per barrel.  The windfall profit per barrel is generally

calculated under section 4988(a) by subtracting the applicable

adjusted base price of each crude barrel of oil, and a severance

tax adjustment, from the removal price.  After this calculation

has been performed, section 4988(b)(1) limits the taxable

windfall profit on any barrel of crude oil to not more than 90

percent of the net income attributable to that barrel of oil.

Pursuant to section 4988(b)(2), the NIL attributable to a

barrel of oil for WPT purposes is generally calculated by

determining "taxable income from the property" from which a

barrel is produced for the taxable year, divided by the number of

barrels of taxable crude oil from such property taken into

account for such taxable year.  In computing the "taxable income

from the property", a taxpayer deducts both direct and indirect

(overhead) expenditures related to that property.

The term "taxable income from the property" generally has

the same meaning that it has for purposes of the NIL on the

deduction for percentage depletion under section 613(a).[17]  As

_____

[17]   Sec. 4988(b) provides, in pertinent part, as follows:

SEC. 4988(b)(3). Taxable income from the property.--For
purposes of this subsection--

(A) In general.--Except as otherwise provided in this
paragraph, the taxable income from the property shall be
(continued...)

such, Congress specifically provided the starting point whereby taxable income from the property must be determined under section 613(a), and, by doing so, Congress adopted the focus on income and expenses of individual properties historically applied under section 613.

Taxable income from the property, pursuant to section 1.613-5(a), Income Tax Regs., is defined as "gross income from the property" (as defined in section 613(c) and sections 1.613-3 and 1.613-4, Income Tax Regs.) less:

> all allowable deductions (excluding any deduction for depletion) which are attributable to mining processes, including mining transportation, with respect to which depletion is claimed. These deductible items include operating expenses, certain selling expenses, administrative and financial overhead, depreciation, taxes deductible under section 162 or 164, losses sustained, intangible drilling and development * * * expenditures, etc. * * * Expenditures which may be attributable both to the mineral property upon which depletion is claimed and to other activities shall be properly apportioned to the mineral property and to such other activities.  Furthermore, where a taxpayer has more than one mineral property, deductions which are not directly attributable to a specific mineral property shall be properly apportioned among the several properties. * * *

Accordingly, section 1.613-5(a), Income Tax Regs., controls the computation of the NIL for both percentage depletion and WPT purposes.

---

[17](...continued)
    determined under section 613(a). [Emphasis added.]

Petitioners, in reliance on <u>Shell Oil Co. v. Commissioner</u>, 89 T.C. 371 (1987), supplemented by 90 T.C. 747 (1988), revd. in part and remanded in part 952 F.2d 885 (5th Cir. 1992), argue that they are entitled to claim the benefit of changes in law, new facts, or any other item that might affect the taxpayer's liability.  See secs. 6511, 6512(b); see also <u>Stone v. White</u>, 301 U.S. 532, 534-535 (1937); <u>Bull v. United States</u>, 295 U.S. 247, 260-262 (1935).  Petitioners assert that this is precisely what they did here, i.e., that after reviewing their records in preparation for these cases, petitioners claimed in their petitions the benefit of changes in law as set forth in <u>Shell Oil</u>.  Petitioners further assert that contrary to respondent's contention, it is not necessary that they show authority permitting their percentage depletion apportionment method to be radically different from their WPT apportionment method.

We disagree.  Given that petitioners claimed the benefits of percentage depletion and are subject to the WPT, they are faced with the dilemma of explaining what authority permits them to compute an NIL for percentage depletion purposes and an NIL for WPT purposes, both of which are calculated under section 1.613-5(a), Income Tax Regs., in a way that achieves radically different results.

Section 4988(b)(3)(A) expressly states that "the taxable income from the property <u>shall</u> be determined under section 613(a)." (Emphasis added.)  Thus, when Congress enacted the WPT,

it grafted the WPT NIL onto the existing body of percentage depletion law by incorporating section 613(a) into section 4988(b)(3)(A).  A plain reading of section 4988(b)(3)(A) requires petitioners to compute the NIL for WPT purposes in the same manner as they computed the NIL under section 613 for percentage depletion purposes.  See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984) (the court must give effect to the unambiguously expressed intent of Congress).  It is unreasonable to believe Congress intended to allow taxpayers to compute their NIL differently for percentage depletion purposes and WPT purposes, where Congress explicitly incorporated by reference, the section 613 NIL calculation into section 4988.  If taxpayers were able to utilize petitioners' approach they could manipulate their allocation methods under sections 613 and 4988, thereby allowing taxpayers to increase their percentage depletion deductions by excluding certain items of overhead from the allocation process, and decrease their WPT by including the same items of overhead in the allocation process.  Cf. Portland Golf Club v. Commissioner, 497 U.S. 154, 166-170 (1990)(taxpayer was required to use same method of allocating fixed expenses, in determining whether nonmember sales activity was undertaken with intent to earn profit, that it did in calculating its actual loss from those sales).

Finally, we note that petitioners' reliance on Shell Oil Co. v. Commissioner, supra, is misplaced, because in that case the

Court of Appeals for the Fifth Circuit was not faced with the issue herein of whether a taxpayer must figure the NIL consistently under sections 613 and 4988.  Rather, the issues in Shell Oil Co. v. Commissioner, supra, concerned the attribution and allocation of expenses for the calculation of the taxable income from the taxpayer's oil and gas properties under section 1.613-5(a), Income Tax Regs., for purposes of the WPT NIL.  As discussed supra note 16, in the instant cases we never reach the issue of whether petitioners' allocation method is defensible under cost accounting principles, because we find based on respondent's threshold argument that petitioners are bound by their original computations.

Thus, based on the record and the facts discussed herein, we hold that petitioners are not entitled to recompute Petroleum's WPT NIL computations for the taxable periods of 1983, 1984, and 1985, where the recomputations do not follow the percentage depletion calculations claimed on their original Federal income tax returns.

To reflect the foregoing,

Decisions will be entered

under Rule 155.