T.C. Memo. 2013-258

UNITED STATES TAX COURT

BRADLEY C. REIFLER AND NANCY REIFLER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18082-10.                    Filed November 13, 2013.

On or about Oct. 15, 2001, the extended due date for Ps' 2000
Federal income tax return, Ps submitted to R's Andover,
Massachusetts, Service Center a joint Federal income tax return for
2000, signed under penalties of perjury by P-H, but not by P-W.
Upon receipt, the service center date-stamped the return, made
handwritten markings indicating a missing signature, and mailed the
return back to Ps with a form requesting that P-W sign it and that Ps
return it to the service center within 20 days. Ps did not mail back the
2000 return with P-W's signature to the service center as requested.
On July 29, 2002, respondent issued a "Taxpayer Delinquency
Notice" to Ps. In response, Ps submitted a second joint Federal
income tax return for 2000. The second 2000 return was identical to
the first except that it was signed by both Ps opposite a date of Aug.
25, 2002, and bore neither the Oct. 15, 2001, date stamp nor the
service center's markings on the original return. It was received by
the service center on Sept. 2, 2002. Beginning on July 1, 2005, R
obtained from Ps a series of consents extending the period of

[*2] limitations on assessment and collection for 2000 until June 30, 2010, a date after the May 17, 2010, issuance of the notice of deficiency covering Ps' 2000 tax year. Ps allege that those consents are invalid because the I.R.C. sec. 6501(a) period of limitations on assessment and collection with respect to Ps' 2000 Federal income tax expired on Oct. 15, 2004, three years after they filed the initial 2000 return.

     Held: Ps are estopped from raising the affirmative defense of the period of limitations with regard to any 2000 deficiencies; 2000 remains open for assessment and collection of Federal income tax.

Kevin M. Flynn, for petitioners.

Carina J. Campobasso, Janet F. Appel, and Erika B. Cormier, for respondent.

MEMORANDUM OPINION

HALPERN, Judge: Both parties have moved for partial summary judgment (petitioners' motion, respondent's motion, or, together, motions). Each party objects to the other's motion. The issue common to the motions is whether the section 6501(a)[1] three-year period of limitations on assessment and collection

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2000, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[*3] (period of limitations) with respect to petitioners' 2000 Federal income tax expired before respondent issued the statutory notice of deficiency (notice), covering petitioners' 2000-2005 taxable years, upon which this case is based. Petitioners ask that we grant their motion to declare 2000 a closed year on the ground that the period of limitations expired before respondent issued the notice. Respondent asks that we grant his motion to declare 2000 still open for assessment on the ground that the period of limitations did not expire before his issuance of the notice.[2]

## Background

The parties base their motions on material facts that, for purposes of the motions, are not in dispute, so that the period of limitations issue involves only questions of law. Therefore, that issue is ripe for disposition by summary judgment. See Rule 121(b).

The undisputed material facts are derived from the motions and various affidavits, declarations, and exhibits either attached to the motions or incorporated therein by reference.

---

[2]Pursuant to sec. 6503(a)(1), the issuance of a timely notice of deficiency suspends the running of the period of limitations while the Commissioner is prohibited from making assessments as provided in sec. 6213(a); i.e., for 90 days or, if a petition is filed with this Court, until our decision has become final.

[*4] <u>Preparation and Filing of Petitioners' 2000 Return</u>

In 2000 and for many years prior thereto, Bradley C. Reifler (petitioner) had as his certified public accountant David Meyrowitz, whose firm at the time, Levine, Levine & Meyrowitz, prepared petitioners' Federal and State income tax returns. That firm prepared petitioners' 2000 joint Federal income tax return (2000 return or original 2000 return).

Mr. Meyrowitz, on petitioners' behalf, requested and obtained from respondent extensions of the time in which to file the 2000 return until October 15, 2001.

Consistent with their practice since their marriage in 1988, petitioners desired and intended to file a joint return for 2000, and, indeed, the 2000 return was prepared as a joint return (e.g., they selected a filing status of "married filing joint return", and the return reported income from activities in which both petitioners participated). Also, consistent with her prior years' practice, Mrs. Reifler authorized petitioner to file the 2000 return on her behalf. Nonetheless, apparently in his rush to meet the October 15, 2001, filing deadline for the 2000 return, petitioner, having added his signature to that of Mr. Meyrowitz (as preparer), inadvertently failed to have Mrs. Reifler sign the return before mailing it to respondent's Andover, Massachusetts, Service Center (service center or

**[\*5]** Andover Service Center). The 2000 return bore no date next to petitioner's signature or next to the space for Mrs. Reifler's signature, and it bore a date of October 9, 2001, next to Mr. Meyrowitz's signature.

The Service Center's Handling of the 2000 Return

Sometime after its receipt of the 2000 return, the service center returned it to petitioners. Although there is no direct evidence explaining why the service center returned the 2000 return to petitioners, the standard Andover Service Center operating procedures in effect at the time indicate that, as a return received after the unextended due date of April 15, 2001, it would have been date-stamped as of the date of receipt, and, if accepted for filing, it would have received a 13-digit "document locator number" (DLN) stamped on the top right-hand corner of the first page. If the return was deemed defective and, therefore, not acceptable for filing, the service center would not have stamped a DLN on page 1, and, if it showed a refund due (as did the 2000 return), the service center would have returned the original return to petitioners with a Form 3531, Request for Missing Information or Papers to Complete Return, explaining why the return could not be

**[\*6]** accepted as a valid Federal income tax return.[3]  The service center would not have retained a copy of the Form 3531 checklist sent to petitioners.

Included in the Form 3531 checklist of potential return defects is the failure by one or both taxpayers submitting a joint return to sign the return under penalties of perjury; i.e., below the jurat statement.  Because the 2000 return's sole defect was that it had not been signed by both taxpayers, the service center also would have sent to petitioners a Notice 649, You Forgot to Sign Your Return, which states, in pertinent part:  "We are sending your return back because it wasn't signed.  We can't process your return without your signature.  Please sign your return in the space provided and return it <u>within 20 days</u>.  If this is a joint return, both husband and wife must sign it."

---

[3]If a return shows tax due, the service center does not return it to the taxpayer.  Rather, it sends out a notice advising the taxpayer of the defect together with the forms necessary to perfect the return.  Respondent explains that the reason for the service center's retention of tax-due returns is that retention is necessary in order to make the assessment of tax which, in turn, is necessary in order to process the accompanying check; i.e., in order to establish a tax liability to which the check may be applied.  If respondent were to return to the taxpayer both the check and the defective return, the taxpayer could be liable for an addition to tax for failure to timely pay his or her tax liability.  <u>See</u> sec. 6651(a)(2). We find that to be a reasonable explanation of the service center's divergent treatment of tax-due versus refund-due returns, and we reject petitioners' argument that it constitutes an impermissible manipulation of the period of limitations.

**[*7]** Service center operating procedures also required that, upon receipt of an unsigned income tax return (with no other defects), service center personnel place an "S" in red ink at the top left-hand corner of page 1 of the return. The purpose of the red "S" was to indicate that the return's only defect was that it was missing one or two signatures and that it was necessary to send a Notice 649 to the taxpayer(s) along with the return. The red "S" was not removed or covered by service center personnel when the return was sent back to the taxpayer(s) for signature.

Petitioners' Handling of the 2000 Return

During the Internal Revenue Service (IRS) examination of petitioners' 2000-2005 returns, petitioners' counsel furnished to the revenue agent conducting the examination (revenue agent) a copy of what both the revenue agent (according to counsel's representations) and petitioners' counsel believed to be the 2000 return. Consistent with service center policy applicable to unsigned returns, page 1 of the 2000 return presented to the revenue agent bore an original (raised) date stamp displaying an October 15, 2001, date of receipt, and there was no 13-digit DLN in the top right-hand corner. Inconsistent with service center policy of returning to taxpayers only defective returns, the 2000 return that petitioners' counsel

**[\*8]** presented to the revenue agent contained both petitioners' signatures along with Mr. Meyrowitz's signature as preparer.

An expert report (report) prepared by an IRS "Physical Scientist/Ink Chemist" establishes that page 1 of the 2000 return was altered by applying opaquing fluid to hide a red "S" in the top left-hand corner, and Mrs. Reifler's original signature was added to photocopy signatures of petitioner and Mr. Meyrowitz on a photocopy of page 2 of the return. The report also establishes that there were indentations on page 3 of the return indicating that (1) check marks had been made on the line on page 2 where Mrs. Reifler should have signed and dated it and (2) both petitioner and Mr. Meyrowitz had signed the return in the appropriate places on page 2. Finally, the report establishes that, on the basis of the pattern of the staple holes in the return, pages 3 to the end had been stapled together more times than pages 1 and 2.

The report, thus, establishes that (1) someone used opaquing fluid to hide the red "S" on page 1 and the check marks on page 2 of the 2000 return, (2) only petitioner and Mr. Meyrowitz signed the return (a fact that was confirmed by petitioners' counsel's discovery, after a search of his files, of the original page 2, with petitioner's and Mr. Meyrowitz's, but not Mrs. Reifler's, original signatures), and (3) someone had removed the original page 2 from the return and substituted a

**[*9]** photocopy of that page with the checkmarks on the original page 2 signature line for Mrs. Reifler hidden from view, there appearing instead Mrs. Reifler's original signature.

Petitioner acknowledged, in an affidavit dated November 2, 2011, his responsibility for the foregoing return alterations as follows:

> I believe that shortly after the original 2000 tax return was returned to me, I needed a completely signed return, i.e., a return that included my wife's signature, for some purpose having nothing to do with the IRS. It may have been to secure a line of credit or for purposes of business financing, or for some other business reason. As a result, I now believe that I covered the check marks on page 2 of the return with an opaquing material, photocopied the page, and then asked my wife to sign the copy of page 2 in 2001. It appears that while I separately kept the original of page 2, I attached the page 2 that I had photocopied, and had asked my wife to sign, to the rest of the return that had been returned to me by the IRS.

Petitioner does not explain the use of opaquing material to obscure the red "S" on page 1 of the 2000 return furnished to the revenue agent.

Thus, it is undisputed that (1) Mrs. Reifler failed to sign the 2000 return filed on or about October 15, 2001, and (2) the service center treated that return as a defective return and sent it back to petitioners in order to obtain the missing signature, in accordance with its normal procedures in such circumstances. It is also undisputed that (1) petitioners did not have Mrs. Reifler sign the 2000 return and refile it with respondent as requested, (2) Kevin M. Flynn, petitioners'

[*10] counsel, mailed a copy of page 1 of the return with the October 15, 2001, date stamp to the revenue agent in connection with the 2000-2005 audit no earlier than the summer of 2006, and he first furnished to the revenue agent a copy of the entire return with the October 15, 2001, date stamp and the photocopied page 2 containing Mrs. Reifler's original signature in 2006, 2007, or 2008 in connection with the audit, and (3) petitioner and Mr. Flynn first presented to respondent the original page 2 of the 2000 return, signed by petitioner and Mr. Meyrowitz, but not by Mrs. Reifler, as an attachment to affidavits, dated November 2, 2011, which explained why that page had not been attached to the 2000 return initially submitted to the revenue agent.[4]

The Second 2000 Return

On July 29, 2002, respondent issued a "Taxpayer Delinquency Notice" to petitioners. In response to that notice, petitioners filed a second joint Federal income tax return for 2000 (second 2000 return). Both petitioners signed that return and dated it August 25, 2002. Mr. Meyrowitz signed as preparer on August

---

[4]It is undisputed for purposes of the motions that both petitioner and Mr. Flynn were unaware that the 2000 return initially presented to the revenue agent was not the original 2000 return and that, not until after their receipt of the report, which prompted the investigation that led to the discovery of the original page 2, did Mr. Flynn know of (and petitioner remember) the substitution of the altered and photocopied page 2, with Mrs. Reifler's original signature, for the original page 2.

[*11] 19, 2002. The return shows a handwritten notation on page 1 that it was received by respondent on September 2, 2002. Except for the addition of petitioners' and Mr. Meyrowitz's original signatures (replacing petitioner's and Mr. Meyrowitz's original signatures on the original 2000 return), the insertion of dates opposite petitioners' signatures, and a new date opposite Mr. Meyrowitz's signature, the second 2000 return and the original 2000 return are identical.

Extensions of the Period of Limitations

The 2000-2005 audit began on April 29, 2004. Thereafter, on July 1, 2005, Mr. Meyrowitz (then representing petitioners in connection with the audit) executed a Form 872-I, Consent to Extend the Time to Assess Tax As Well As Tax Attributable to Items of a Partnership, extending the period of limitations with respect to petitioners' 2000 Federal income tax liability to December 31, 2006. On September 15, 2006, June 25, 2007, and August 6, 2008, either Mr. Flynn or petitioners executed Forms 872-I, which, together, extended the period of limitations for 2000 to June 30, 2010. Accompanying the execution of the first two Forms 872-I were cover letters from Mr. Meyrowitz (accompanying the first extension) and Mr. Flynn (accompanying the second extension) in which both argued that the consents were invalid as a matter of law because they (and, by

[*12] implication, any to follow) were (or would be) executed after the period of limitations for 2000 had expired on October 15, 2004.[5]

Respondent mailed the notice to petitioners on May 17, 2010, before the June 30, 2010, expiration of the last extension.

Residence

Petitioners resided in New York when they filed the petition.

Discussion

I.      Validity of the 2000 Return

Respondent argues that the 2000 return was an invalid joint return because it was not signed by Mrs. Reifler under penalties of perjury.  Therefore, it did not start the running of the period of limitations for 2000.  Rather, respondent argues that the second 2000 return was the only valid return that petitioners filed for 2000, and that return (not the original 2000 return) began the running of the period of limitations for 2000.

In arguing that the original 2000 return was an invalid return, respondent relies upon section 6011(a) (taxpayers must "make a return * * * according to the

---

[5]It appears that Mr. Meyrowitz's letter, dated July 1, 2005, was the first notification to respondent that petitioners had submitted the original 2000 return and that they considered it to be the return that triggered the running of the period of limitations for 2000.

[*13] forms and regulations prescribed by the Secretary"); section 6061(a) ("any return * * * shall be signed in accordance with forms or regulations prescribed by the Secretary"); section 1.6011-1(b), Income Tax Regs. (returns that fail to include "the information required to be included therein * * * will not be accepted as meeting the requirements of the Code."); and section 1.6013-1(a)(2), Income Tax Regs. ("A joint return of a husband and wife * * * shall be signed by both spouses."). Respondent also cites the Form 1040 instructions for 2000, at 52, which state: "Form 1040 is not considered a valid return unless you sign it. If you are filing a joint return, your spouse must also sign." Respondent also relies upon our decision in Beard v. Commissioner, 82 T.C. 766, 777 (1984), aff'd, 793 F.2d 139 (6th Cir. 1986), wherein, relying upon Supreme Court precedent, we list four criteria for determining "whether a document is sufficient for statute of limitations purposes", the criterion relevant to the motions being that "the taxpayer must execute the return under penalties of perjury."[6] See also Zellerbach Paper Co. v. Helvering, 293 U.S. 172, 180 (1934) (holding that tax return is not a nullity "if it

---

[6]For purposes of his motion, respondent accepts that the only defect in the 2000 return was the absence of Mrs. Reifler's signature under penalties of perjury. Therefore, we need not discuss the other three Beard criteria for a valid return, i.e., that the return (1) contain "sufficient data to calculate the tax liability", (2) "purport to be a return", and (3) represent "an honest and reasonable attempt to satisfy the requirements of the tax law".

**[*14]** purports to be a return, is sworn to as such * * * and evinces an honest and genuine endeavor to satisfy the law"); Lucas v. Pilliod Lumber Co., 281 U.S. 245, 249 (1930) ("Here assent that the statute [of limitations] might begin to run was conditioned upon the presentation of a return duly sworn to.").[7] See also section 6065, which generally provides that a valid return "shall contain or be verified by a written declaration that it is made under the penalties of perjury."

Petitioners counter that, because (1) the 2000 return was in "substantial compliance" with the Beard requirements for a valid return and (2) petitioners intended that the 2000 return constitute a joint return, it must be considered a valid return for period-of-limitations purposes. The first argument is essentially an argument that the 2000 return satisfied the first three Beard requirements (which is undisputed for purposes of the motions) and fails to acknowledge that execution of a return under penalties of perjury is a separate and distinct requirement. The second argument, however, is supported by a line of cases that have created an exception to the general rule that, to have a valid return, it must be signed by the

_____

[7]Congress' 1942 change from requiring a sworn statement to requiring a signature under penalties of perjury was made for taxpayer convenience. It was not intended to effect any substantive change in the law. See Vaira v. Commissioner, 52 T.C. 986, 1005 (1969), aff'd on this issue, rev'd and remanded on other grounds, 444 F.2d 770 (3d Cir. 1971); Wallace v. Commissioner, T.C. Memo. 1975-133, 1975 Tax Ct. Memo LEXIS 240, at *8-*9.

[*15] taxpayer (or both taxpayers, in the case of a joint return) under penalties of perjury. That exception holds that if an "income tax return is intended by both spouses as a joint return, the absence of the signature of one spouse does not prevent their intention from being realized." Estate of Campbell v. Commissioner, 56 T.C. 1, 12 (1971). The rule is generally applied when one spouse signs a joint return (usually signing for both spouses) and it is shown that the other spouse has tacitly consented to the joint return filing. It is, therefore, commonly referred to as the tacit consent rule. See, e.g., Hennen v. Commissioner, 35 T.C. 747, 748 (1961); Harris v. Commissioner, T.C. Memo. 1961-324, 1961 Tax Ct. Memo LEXIS 22, at *11. Because it is undisputed, for purposes of the motions, that Mrs. Reifler consented to petitioners' filing of a 2000 joint return, petitioners argue that, pursuant to the tacit consent rule, the 2000 return constituted a valid joint return.

Respondent rejects that argument on the ground that courts have employed the tacit consent rule exclusively on the Commissioner's behalf to enable the Commissioner to hold the consenting, nonsigning spouse jointly liable for a deficiency otherwise exclusively attributable to the signing spouse (or have refused to so employ it on the ground of lack of spousal consent). See, e.g., Estate of Campbell v. Commissioner, 56 T.C. at 12; Hennen v. Commissioner, 35 T.C. at 748-749; Federbush v. Commissioner, 34 T.C. 740, 757-758 (1960), aff'd, 325

[*16] F.2d 1 (2d Cir. 1963); Simms v. Commissioner, T.C. Memo. 1968-298, 1968 Tax Ct. Memo LEXIS 1, at *28-*29, aff'd per curiam, 422 F.2d 340 (4th Cir. 1970); Harris v. Commissioner, 1961 Tax Ct. Memo LEXIS 22, at *10-*11. Thus, respondent argues that the tacit consent rule "has no bearing on the question of whether a Form 1040, signed by one spouse but not the other, is an income tax return for statute of limitations purposes", also citing caselaw to the effect that "[s]tatutes of limitation that bar the rights of the government are to be strictly construed in its favor." See, e.g., E.I. Du Pont De Nemours & Co. v. Davis, 264 U.S. 456, 462 (1924). Respondent further argues that the tacit consent rule cannot overcome the requirement that, in order to secure the benefit of a period of limitations barring Government collection of a tax liability, "a taxpayer * * * must demonstrate 'meticulous compliance * * * with all named conditions' and applicable requirements of the Code and the Treasury Regulations." Allnutt v. Commissioner, 523 F.3d 406, 412 (4th Cir. 2008) (quoting Pilliod Lumber Co., 281 U.S. at 249), aff'g T.C. Memo. 2002-311.

In an effort to defuse respondent's attempt to so limit the tacit consent rule, petitioners cite Downing v. Commissioner, T.C. Memo. 2007-291, 2007 WL 2768754, at *9, in which we addressed the taxpayer's contention that he and his wife filed a joint return (of which respondent had no record) that triggered the

**[*17]** commencement of the period of limitations.  The taxpayer could produce no

return containing his wife's signature, and we found "no credible evidence to

establish that * * * [the wife] ever intended to file a * * * joint return with * * *

[her husband] or that she even tacitly consented to the filing of a joint return".

Downing v. Commissioner, 2007 WL 2768754, at *10.  Moreover, we concluded

that the taxpayer filed no return for the year in question, and, on that basis, we

rejected his affirmative defense that the period of limitations had run.  Id. at *9.[8]

---

[8]In support of their argument that a joint return signed by one spouse is a
valid return for period of limitations purposes, petitioners also cite White v.
Commissioner, T.C. Summary Opinion 2002-101, in which the Commissioner
conceded that a return signed by only one spouse is entitled to joint return filing
status.  We held that the timely filing of that return negated the Commissioner's
attempt to impose the sec. 6651(a)(1) addition to tax for failure to file timely,
which was based on the taxpayer's untimely resubmission (at the Commissioner's
request) of the return at a later date.  Petitioners acknowledge that, as a Summary
Opinion, White "does not carry precedential weight", but they argue that it is
"probative" in that it confirms their argument that the running of the three-year
limitations period is triggered by the filing of an initial imperfect, but
"substantially compliant", return, not by the later resubmission of the return at the
Commissioner's request.

While sec. 7463(b) precludes our Summary Opinions' being treated as
precedent in any other cases, our Rules do not prohibit the citation of Summary
Opinions, so that we may give consideration to our reasoning and conclusions in
such opinions to the extent that they are persuasive.

Because the Commissioner conceded the validity of a joint return executed
by only one spouse, the validity of the taxpayers' return was not a litigated issue in
White.  Therefore, even if White did "carry precedential weight", it would be

(continued...)

**[\*18]** In essence, the parties raise the issue of whether the tacit consent rule is, effectively (1) a one-edged sword that only the Commissioner may wield in an effort to impose joint liability on a nonsigning spouse or (2) a two-edged sword that the taxpayer may also employ to invoke a defense based upon the expiration of the period of limitations. In <u>Downing</u>, since we rejected the taxpayer's affirmative defense on the ground that he had filed no return for the year in question, we did not reach that question.

In this case, because we are persuaded to decide the motions in respondent's favor by his alternative argument, based upon the principle of equitable estoppel (<u>see</u> <u>infra</u>), we likewise find no need to resolve the parties' dispute over the applicability of the tacit consent rule. As we stated in <u>McLaine v. Commissioner</u>, 138 T.C. 228, 242 (2012) (quoting <u>Whitehouse v. Ill. Cent. R.R.</u>, 349 U.S. 366, 372-373 (1955)): "[T]he better course is 'to observe the wise limitations on our

---

[8](...continued)
inapposite. The Commissioner's concession of an issue in a case, especially a Tax Court case resulting in a nonprecedential Summary Opinion, does not bind him for future cases as would the same position set forth in a revenue ruling or other form of official public guidance. See <u>Dover Corp. & Subs. v. Commissioner</u>, 122 T.C. 324, 350 (2004); <u>Rauenhorst v. Commissioner</u>, 119 T.C. 157, 170-173 (2002); <u>see also</u> <u>IBM Corp. v. United States</u>, 343 F.2d 914, 919 (Ct. Cl. 1965) (stating that, as a general rule, a taxpayer "can never avoid liability for a proper tax by showing that others have been treated generously, leniently, or erroneously by the Internal Revenue Service").

[*19] function and to confine ourselves to deciding only what is necessary to the disposition of the immediate case.'"

II.     Equitable Estoppel

     A.     Discussion

Assuming arguendo that the 2000 return was a valid return and that the period of limitations expired before respondent issued the notice, respondent argues alternatively that petitioners are equitably estopped from raising the period of limitations as an affirmative defense to the proposed 2000 deficiency.

In McCorkle v. Commissioner, 124 T.C. 56, 68 (2005), we stated: "Equitable estoppel is a judicial doctrine that precludes a party from denying that party's own acts or representations that induce another to act to his or her detriment." We have also noted that the doctrine "is based on the grounds of public policy, fair dealing, good faith, and justice, and is designed to aid the law in the administration of justice where without its aid injustice might result." Union Tex. Int'l Corp. v. Commissioner, 110 T.C. 321, 327 (1998). The party affirmatively asserting application of the doctrine "has the burden of proving all the essential elements constituting the estoppel." Id. Thus, on the basis of the agreed facts, respondent bears the burden of proving by a preponderance of the evidence each of the elements of equitable estoppel. See Merkel v. Commissioner,

**[\*20]** 109 T.C. 463, 476 (1997) ("usual measure of persuasion required to prove a fact in this Court is 'preponderance of the evidence'"), aff'd, 192 F.3d 844 (9th Cir. 1999); see also Rules 39, 142(a).

The Court of Appeals for the Second Circuit, the court to which, barring written stipulation to the contrary, an appeal of this case would lie, see sec. 7482(b)(1)(A), (2), has set forth the elements of equitable estoppel as follows.

> "(1) [T]here must be a false representation or wrongful misleading silence; (2) the error must originate in a statement of fact, not in opinion or a statement of law; (3) the one claiming the benefits of estoppel must not know the true facts; and (4) that same person must be adversely affected by the acts or statements of the one against whom an estoppel is claimed."

Stair v. United States, 516 F.2d 560, 564 (2d Cir. 1975) (quoting Lignos v. United States, 439 F.2d 1365, 1368 (2d Cir. 1971)); accord McCorkle v. Commissioner, 124 T.C. at 68. Because there is no dispute as to the relevant facts, we treat respondent's claim of estoppel as raising an issue of law. McCorkle v. Commissioner, 124 T.C. at 68.

In Century Data Sys., Inc. v. Commissioner, 86 T.C. 157, 166 (1986), which, like this case, involved the Commissioner's contention that the taxpayer was equitably estopped from asserting the period of limitations as a defense to proposed deficiencies, we summarized the principles for applying the doctrine in

**[\*21]** such a case as follows: "To be estopped from asserting the statute of limitations, petitioner must be shown to have taken some action which led respondent to postpone until after the statute expired the issuance of a deficiency notice that he was otherwise prepared to mail on a timely basis."

We agree with respondent that the foregoing criteria for the application of equitable estoppel herein are satisfied.

1.     <u>There Was a False Representation or Misleading Silence</u>.

In accordance with its standard operating procedures for processing joint returns with only one signature, the Andover Service Center date-stamped page 1 of the 2000 return upon receipt, placed a red "S" on the same page indicating a missing signature, and placed check marks, on page 2, on the line for Mrs. Reifler's missing signature. We further assume that, in accordance with those same operating procedures, the service center, thereupon, mailed the 2000 return back to petitioners together with a Form 3531, listing the defect in the return (in this case, the lack of Mrs. Reifler's signature), and a Notice 649 specifically requesting that Mrs. Reifler "sign * * * [the] return in the space provided and return it <u>within 20 days</u>."[9]

---

[9]It is undisputed that the service center returned the 2000 return to petitioners, and, although there is no confirmation in the file that the service center

(continued...)

**[\*22]** Petitioners never returned the original 2000 return to the service center. Having no record of petitioners' having filed a return for 2000, respondent, on July 29, 2002, mailed to petitioners a "Taxpayer Delinquency Notice" informing them that they had not filed a 2000 return.[10] In response to that notice, on September 2, 2002, petitioners filed the second 2000 return, identical to the original 2000 return, but with the original signatures of both petitioners, dated August 25, 2002, and with Mr. Meyrowitz's signature as preparer, dated August 19, 2002. There is no evidence, nor do petitioners claim, that, when they filed the second 2000 return, they advised respondent that that return--contemporaneously dated by both of

_____

[9](...continued)
accompanied its return of the 2000 return to petitioners with either a Form 3531 or a Notice 649, petitioners do not dispute that, pursuant to its normal operating procedures, the service center would have mailed both documents to petitioners. Under the presumption of official regularity, courts presume, in the absence of clear evidence to the contrary, that public officers have properly discharged their official duties. See United States v. Chem. Found., Inc., 272 U.S. 1, 14-15 (1926). Because there is no evidence that would rebut the application of the presumption herein, we assume for purposes of the motions that the service center mailed both a Form 3531 and a Notice 649 to petitioners together with the 2000 return. Moreover, it is illogical to assume otherwise; i.e., to assume that respondent returned the 2000 return to petitioners with no explanation as to why it was being returned and no instructions as to what to do with it.

[10]Although the parties have not furnished a copy of the "Taxpayer Delinquency Notice" mailed to petitioners, it is normally the function of such a notice to inform the taxpayer that an unfiled return is overdue. See, e.g., Dickow v. United States, 654 F.3d 144, 147 (1st Cir. 2011).

[*23] them and by Mr. Meyrowitz--constituted a <u>copy</u> of the return, received by respondent 10 months earlier, on October 15, 2001, which respondent had returned to them for Mrs. Reifler's signature.  For all intents and purposes, the second 2000 return, filed in response to the "Taxpayer Delinquency Notice", would have appeared to respondent to be petitioners' delinquently filed, original 2000 return.[11]  It was not until respondent received Mr. Meyrowitz's July 1, 2005, letter accompanying the first Form 872-I, which extended the period of limitations for 2000 to December 31, 2006, that respondent was made aware of petitioners' claim that they had filed their 2000 return on October 15, 2001, and that, therefore, the Form 872-I was invalid because it was executed after the period of limitations for 2000 had expired on October 15, 2004.

We find that together (1) petitioners' failure to return the original 2000 return to respondent with the addition of Mrs. Reifler's signature, as respondent

---

[11]Petitioner filed an affidavit in which he alleges that "the IRS requested a copy of my Form 1040 for * * * 2000", and that, when he sent it, he "knew that it was only a copy, and that * * * [his] original return had been timely filed with the IRS on or before October 15, 2001."  Accepting, as we must for purposes of deciding the motions, the genuineness of petitioners' belief regarding the status of the second 2000 return as merely a copy of the original 2000 return, we note that it is irrelevant in determining respondent's right to invoke equitable estoppel herein. The question is whether petitioners' actions and/or silence regarding that return, innocent or not, misled respondent into believing it was petitioners' delinquently filed, original 2000 return.

[*24] had requested, and (2) their subsequent filing of the second 2000 return, which (A) on its face, appeared to be petitioners' delinquent, original 2000 return and (B) was unaccompanied by any notice that it was a copy of a return filed on October 15, 2001, constitute both (1) a false representation that the second 2000 return was the originally filed 2000 return and (2) a wrongful, misleading silence regarding the existence and prior filing of the original 2000 return. Had petitioners mailed the original 2000 return back to respondent within 20 days of receipt, as requested, respondent would have been able to timely request a consent to extend the period of limitations for 2000 based upon the October 15, 2001, filing date of that return. Because they did not do so, respondent was unaware that that limitations period would expire on October 15, 2004.[12]

Petitioners reject as "meritless" respondent's argument that their actions (filing a newly signed and dated return in response to the service center request that they perfect and return the original 2000 return) furnish grounds for applying equitable estoppel herein. Petitioners cite our nonprecedential Summary Opinion in White v. Commissioner, T.C. Summary Opinion 2002-101; they also cite

---

[12]We do not consider relevant the extent to which the revenue agent may have been misled by petitioners' initial proffering of the 2000 return with the altered pages 1 and 2 as their original 2000 return because that occurred after the period of limitations for 2000 had already expired.

[*25] <u>Blount v. Commissioner</u>, 86 T.C. 383 (1986). In <u>White</u>, we treated the taxpayer's original, timely filed return--and not the subsequently refiled and resigned copies submitted at the Commissioner's request--as the relevant return in holding that the taxpayer was not liable for an addition to tax for failure to timely file under section 6651(a)(1).[13] In <u>Blount</u>, the taxpayers failed to attach a Form W-2, Wage and Tax Statement, to their return. We rejected the Commissioner's argument that "it is logistically impossible for him to retain the return filed without a Form W-2 while he notifies the taxpayer of the omission and awaits the taxpayer's response." While recognizing the "formidable" administrative task confronting the Commissioner in such circumstances, we held that "once a return has been filed (or is deemed filed), the period of limitations on assessment begins to run"; it does not begin to run from the filing date of the resubmitted return (which, in <u>Blount</u>, occurred seven days after the service center mailed the return to the taxpayers). <u>See</u> <u>Blount v. Commissioner</u>, 86 T.C. at 385, 387-388.

In both <u>White</u> and <u>Blount</u>, the originally submitted return was either retained by the service center or shortly returned by the taxpayer to the service center, presumably bearing the date stamp evidencing the date on which it initially

---

[13]Even though sec. 7463(b) precludes our Summary Opinions' being treated as precedent for any other case, we have chosen to discuss it here only to reiterate our previous point that it is inapposite.

**[\*26]** had been received.  In this case, petitioners kept the original, date-stamped

return that the service center had returned to them until after the period of

limitations, measured from the initial submission date, had expired.  Had

petitioners resubmitted that return within 20 days as requested by the Andover

Service Center, respondent would have been actually or constructively alerted to

the original filing date, as he was in both White and Blount, when there was still

ample time in which to issue a notice of deficiency or obtain a consent extending

the period of limitations.  Not only was respondent not so alerted in this case; he

was misled by the subsequent filing, on September 2, 2002, of what appeared to be

an original return.  He was misled into believing that that limitations period would

not expire until September 2, 2005.[14]

2.      The Error Originated in a Statement of Fact.

Respondent's error in allowing the period of limitations to expire before

soliciting consents to extend that period was based on his mistaken belief, induced

by petitioners' actions and inactions (i.e., by their submission of what appeared to

---

[14]Petitioner's reason for retaining and altering the original 2000 return ("shortly after the original 2000 tax return was returned to me, I needed a completely signed return * * * for some purpose having nothing to do with the IRS") is irrelevant.  His retention of that return, for whatever reason, until after the period of limitations for 2000 had expired coupled with petitioners' subsequent filing of a second, purportedly original 2000 return was what caused respondent to allow the limitations period to expire.

**[*27]** be a delinquent, original joint return for 2000 with original signatures and contemporaneous dates coupled with their failure to alert respondent to the existence of the previously filed 2000 return), that the second 2000 return was a delinquent, original 2000 return. Clearly, respondent was misled by petitioners as to the facts regarding the commencement of the period of limitations for 2000. There was no erroneous opinion or misstatement of law upon which respondent relied to his detriment.

3.      Respondent Was Unaware of the Facts.

Because the Andover Service Center had returned the original 2000 return to petitioners and, therefore, had no record of its having been filed, respondent was unaware that the second 2000 return, which had the appearance of a delinquent original return, was not the first and only return that petitioners had filed for 2000.

Petitioners argue that any disadvantage that respondent perceives from having failed to retain a copy of the original 2000 return or the Form 3531 checklist of return defects that would have been mailed to petitioners was a disadvantage caused by the service center. Petitioners note that the service center "could have made an entry in petitioners' tax account for * * * 2000 indicating that the Form 1040 was returned to petitioners due to the missing signature * * * [but

**[\*28]** that it] chose not to do so." Petitioners then state that the Austin Service Center processes joint returns that lack one spouse's signature and asks the nonsigning spouse "to execute a declaration." They further state: "It is well-known that other Service Centers follow the same practice."

Petitioners have not called the Court's attention to any provision of the Internal Revenue Manual or other internal IRS guidance that mandates the service center procedures they describe. Moreover, we do not find the Andover Service Center's failure to retain a copy of the 2000 return to be negligent or unreasonable. It reasonably anticipated that petitioners would comply with its request to mail back the original 2000 return signed by Mrs. Reifler within 20 days. It then could have either newly date-stamped the return or recorded the October 15, 2001, filing date already stamped on page 1 and then processed the return. Measured from either date, respondent would have had ample time in which to either issue a notice of deficiency or obtain an extension before the period of limitations for 2000 expired. Petitioners' failure to mail back the return and, some months later, to, instead, file what appeared to be a delinquent, original 2000 return was what caused respondent to allow the period of limitations to expire. The disadvantage to respondent was caused by petitioners, not by the service center.

[*29]     4.     <u>Respondent Was Adversely Affected by Petitioners' Actions</u>.

The notice of deficiency lists almost $17 million of adjustments for 2000, two of which (the disallowance of (1) a $12,207,810 deduction, plus the section 6662 accuracy-related penalty applicable thereto, and (2) an additional deduction of $110,356) petitioners have conceded should we determine that the period of limitations for 2000 remains open.  Thus, it is beyond dispute that respondent was adversely affected by petitioners' actions, which caused respondent to allow that period of limitations to expire.

B.     <u>Conclusion</u>

Petitioners are estopped from raising the affirmative defense of the period of limitations with regard to any 2000 deficiencies.  Therefore, 2000 remains an open year.  Respondent's motion will be granted, and petitioners' motion will be denied.

<u>An appropriate order will be issued</u>.